UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANTON F. LIVERPOOL,

                                    Plaintiff,

                -v.-

CAPTAIN DAVIS, Shield #1282;
OFFICER GREEN, Shield #7507;
OFFICER LARAQUE, Shield #3665;
CAPTAIN KISTE, Shield #958; and
CORRECTION OFFICER LLARCH,
Shield #3352,

                                    Defendants.

17 Civ. 3875 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Anton Liverpool, proceeding *pro se*, brings this action under 42 U.S.C. § 1983, against certain correction officers at the Otis Bantum Correctional Center at Rikers Island ("OBCC"), namely Charles Davis, Brandon Green, James Laraque, Gustavo Kiste, and William Llarch (collectively, "Defendants"), stemming from incidents that occurred while Plaintiff was confined at OBCC. Before the Court now is Defendants' motion for summary judgment, in which Defendants argue: (i) Plaintiff's claims against Defendants Kiste and Llarch are barred by the statute of limitations; and (ii) Plaintiff's claims against all Defendants fail as a matter of law. For the reasons that follow, the Court concludes that Plaintiff's claims against Defendants Kiste and Llarch are indeed untimely, and therefore grants the motion for summary judgment as to those defendants. The Court also grants Defendants' motion for summary judgment against Plaintiff's Eighth Amendment deliberate

indifference to medical needs claim. But Plaintiff's Eighth Amendment failure to protect claim against the remaining defendants survives summary judgment and will not be dismissed on qualified immunity grounds. Accordingly, Defendants' motion is denied in part as to Defendants Davis, Green, and Laraque.

## BACKGROUND[1]

### A. Factual Background

On July 9, 2014, Plaintiff was convicted of a crime under New York State law. (Def. 56.1 ¶ 2). On July 10, 2014, Plaintiff was being detained inside the Main Intake area of OBCC, waiting to be transferred from OBCC to a building for sentenced inmates. (*Id.* at ¶ 3). During this time, Plaintiff was held in

---

[1] The facts stated herein are drawn from Plaintiff's Third Amended Complaint ("TAC" (Dkt. #39)), Defendants' Rule 56.1 Statement of Material Facts Not in Dispute ("Def. 56.1" (Dkt. #59)), and Plaintiff's Rule 56.1(b) Counterstatement of Disputed Material Facts ("Pl. 56.1" (Dkt. #81)), the latter of which comprises both responses to Defendants' assertions of material facts not in dispute and material facts ostensibly in dispute. The Court also draws facts from certain exhibits attached to the Declaration of Nicholas Manningham in Support of Defendants' Motion for Summary Judgment ("Manningham Decl." (Dkt. #57)). Finally, the Court cites to certain of Plaintiff's Exhibits in Opposition to the Motion for Summary Judgment (Dkt. #85), using the Bates number designations at the bottom of each page.

Citations to the parties' Rule 56.1 Statements incorporate by reference the documents and deposition testimony cited therein. *See* Local Rule 56.1(d). Generally speaking, where facts stated in a party's Local Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true. *See* Local Rule 56.1(c), (d); *Biberaj* v. *Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." (internal quotation mark omitted) (quoting *T.Y.* v. *N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009))).

For ease of reference, Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment will be referred to as "Def. Br." (Dkt. #58); Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment as "Pl. Opp." (Dkt. #69); and Defendants' Memorandum of Law in Further Support of Their Motion for Summary Judgment as "Def. Reply" (Dkt. #74).

Pen #6 of the Main Intake area, along with approximately eight other inmates. (*Id.* at ¶ 5). Three other inmates were being held in Pen #1, which was across the hall from Pen #6. (*Id.* at ¶¶ 6-7). Both cells had bars facing the hallway. (*Id.*). Defendants Davis, Green, Laraque, and Larch were among the correction officers working in the Main Intake area of OBCC at that time. (*Id.* at ¶¶ 4, 11).

At some point during the evening of July 10, 2014, one of Plaintiff's fellow inmates in Pen #6, Inmate Brown, began to mix together his feces, saliva, and urine with toilet water, with the intention of throwing it at the three inmates in Pen #1. (Def. 56.1 ¶ 8). One of the correction officers in the Main Intake area saw Brown "relieving himself," and asked him something along the lines of "Why you doing that? Doesn't the toilet work?," but did not otherwise seek to stop him (*Id.* at ¶ 9).[2] Plaintiff implored Brown not to throw the mixture of human waste that he was concocting. (*Id.* at ¶ 10). Plaintiff then told Defendants Davis, Green, Laraque, and Llarch that Brown was going to throw the mixture and asked that he be let out of Pen #6. (*Id.* at ¶ 11). The parties agree that Plaintiff did not tell the correction officers specifically that Brown was going to throw the mixture at him, but Plaintiff did tell the officers that he did not want to be in Pen #6 when Brown began throwing his mixture. (*Id.* at ¶¶ 12-13; Pl. 56.1 ¶ 12). One correction officer spoke to Brown through the bars of Pen #6 and tried to prevent Brown from throwing the mixture. (Def. 56.1 ¶ 14). Brown threatened to throw the mixture at that correction officer if

---

[2]     Plaintiff argues that the officer who asked this question did so in a mocking tone and was not earnestly investigating the situation. (Pl. 56.1 ¶ 9).

she did not move away.  (*Id.*).  The correction officer departed without taking further action, and no other correction officers took preventative action.

Roughly 20 to 30 minutes after Plaintiff alerted the correction officers to the situation (Manningham Decl., Ex. C at 19:3-16), Brown began throwing the mixture at the three inmates in Pen #1.  (Def. 56.1 ¶ 15).  The parties agree that, as Brown threw the mixture at the pen across the hallway, it was "spraying all over the place" and hit Plaintiff as it rebounded off of Pen #6's bars.  (*Id.* at ¶ 16).  Plaintiff adds that some of the mixture hit Plaintiff as it was thrown, and not merely after it came in contact with the pen's bars.  (Pl. 56.1 ¶ 16).  In retaliation, the inmates in Pen #1 began throwing their own mixtures of human waste at the inmates in Pen #6.  (Def. 56.1 ¶ 17; Pl. 56.1 ¶ 17).  Plaintiff estimates that other inmates were throwing mixtures of human waste intermittently over the course of approximately one hour.  (Manningham Decl., Ex. C at 20:3-19; *but cf.* Pl. 56.1 ¶ 19 (claiming that only one inmate in Pen #1 was throwing "urine/[bodily] waste" back to Pen #6).  Defendants do not contest this.

As these events unfolded, the correction officers in the Main Intake Area made verbal attempts to stop the inmates from throwing their respective excretory mixtures.  (Def. 56.1 ¶ 18).  Plaintiff claims that the officers' words were delivered in a mocking tone, and that they did not sincerely try to stop the misbehavior.  (Pl. 56.1 ¶ 18).[3]  Inmate Brown and the inmates in Pen #1 did

---

[3]     Indeed, at his deposition, Plaintiff recounted that:

> They just sat back. Everyone that was in the immediate area, they
> just lean[ed] back on the officers' station and watched and, you

not comply.  (Def. 56.1 ¶ 19).  At some point, Defendant Davis radioed for assistance.  (*Id.*; Pl. 56.1 ¶ 19).  Around midnight, a response team, supervised by Defendant Kiste, arrived in response to this call for assistance.  (Def. 56.1 ¶¶ 20, 22).

Upon entering the Main Intake area, Defendant Kiste observed feces and water on the floor and walls.  (Def. 56.1 ¶ 23).  The response team then ordered all the inmates in Pens #1 and #6 to turn their backs to the hallway and face the walls of their pens.  (*Id.* at ¶ 24).  The three inmates in Pen #1 initially refused to comply with the orders to turn around, causing Kiste to disperse three one-second bursts of "OC spray" — a chemical irritant akin to pepper spray — to the facial area of each of those inmates.  (*Id.* at ¶¶ 26, 27).  The record indicates that the third one-second burst was administered after the third inmate had complied by facing the wall, and was arguably unwarranted. (Pl. 56.1 ¶ 25; Dkt. #85, Def. 101).[4]  The parties dispute whether the OC spray was at any point directed into Pen #6, where Plaintiff was being held.  (Def. 56.1 ¶ 27; Pl. 56.1 ¶ 27).  A video recording of the incident, which the Court has reviewed, suggests that the OC spray was not directed at Pen #6.

---

know, sat in the officers' station and watched it and commented, like it was a sports event.

(Manningham Decl., Ex. C at 20:22-21:1).

[4]  Plaintiff argues that each of the three bursts of OC spray was sustained for longer than one second.  (Pl. 56.1 ¶ 26).  But, as discussed in further detail below, Plaintiff's bare assertions, unsupported by the record in this matter, do not create a genuine dispute of material fact.  The Court has examined a video of the incident in which the OC spray was administered, and each of the bursts lasted approximately one second. (Manningham Decl., Ex. E).

(Manningham Decl., Ex. E).[5]  But an Incident Report Form generated after the incident suggests that OC spray was directed at Brown, who was held in Pen #6.  (Dkt. #85, Def. 99).  This Incident Report Form suggests the possibility that the video may not have captured the full incident.

The response team ordered the inmates in Pen #6, including Plaintiff, to lay on the ground.  (Def. 56.1 ¶ 28).  Plaintiff, who was shirtless, put a white cloth on the floor and laid on top of it, in compliance with the correction officers' order.  (*Id.* at ¶ 30).  The inmates were then handcuffed and escorted out of the Main Intake area, beginning with the inmates held in Pen #1.  (*Id.* at ¶¶ 31, 32).  At some point roughly three hours later, Plaintiff was given a medical shower.  (*Id.* at ¶ 35; Pl. 56.1 ¶ 35).  At around 3:32 a.m., Plaintiff was seen by a physician's assistant in the clinic.  (Def. 56.1 ¶ 36).  The physician's assistant noted that Plaintiff had been exposed to OC spray, but had no visible injuries or signs of chemical irritation or burn.  (*Id.* at ¶ 38).  Plaintiff reported feeling throat irritation for about 24 hours after the incident and felt facial burning for three or four days.  (*Id.* at ¶ 39).

---

[5]  Plaintiff claims that he has been unable to view the video recording of the incident in which Defendant Kiste deployed the OC spray while he has been incarcerated.  (Pl. Opp. 8; Pl. 56.1 ¶ 29).  The Court has viewed the video, which begins as the response team entered the Main Intake area and ends after the inmates held in Pens #1 and #6 have been removed from those areas and are being held in a hallway.  Where Plaintiff's or Defendants' statements of fact are contradicted by the video recording, the Court views "the facts in the light depicted by the videotape."  *Scott* v. *Harris*, 550 U.S. 380, 381 (2007).  Because the Court does not accept wholesale Defendants' version of the facts, and because the Court ultimately dismisses Plaintiff's claims arising out of the events depicted on the video recording for untimeliness, Plaintiff has not been prejudiced by his inability to view the video recording.  Nevertheless, the Court reiterates its belief that incarcerated, *pro se* plaintiffs should — whenever practicable — be permitted to view all materials produced in discovery.

**B.     Procedural Background**

Plaintiff filed his Complaint in this action on May 22, 2017.  (Dkt. #1).[6] Plaintiff named as Defendants Davis, Laraque, Green, and a John Doe defendant.  (*Id.*).  On June 15, 2017, the Court issued an Order of Service, including a provision directing the New York City Law Department to provide Plaintiff with the identity of the John Doe defendant named in the Complaint on or before August 15, 2017, in accordance with *Valentin* v. *Dinkins*, 121 F.3d 72 (2d Cir. 1997).  (Dkt. #7).  The Court further ordered Plaintiff to amend his Complaint to include the name of the John Doe defendant within 30 days of receiving the name.  (*Id.*).  Defendants Davis, Laraque, and Green answered the complaint on September 5, 2017.  (Dkt. #12).

On November 9, 2017, the New York City Law Department filed a letter identifying Gustavo Kiste as the John Doe defendant in Plaintiff's Complaint. (Dkt. #18).  Plaintiff filed a First Amended Complaint on February 6, 2018, substituting Defendant Kiste in place of John Doe.  (Dkt. #27, 29).  Plaintiff filed a Second Amended Complaint on February 13, 2018, adding Defendant Llarch as a defendant for the first time.  (Dkt. #31).  Plaintiff filed a Third Amended Complaint on March 19, 2018.  (Dkt. #39).  Defendants answered the Third Amended Complaint on August 29, 2018.  (Dkt. #47).  On August 21,

---

[6]     Throughout this Opinion, in referring to the date that Plaintiff filed documents in this case, the Court will list the date that the filing was received by the Court and filed on the public docket.  The Court takes note that, because Plaintiff filed these documents through the mail, the documents are typically dated several days earlier than the date on which they were filed.  The differences in these dates would not impact the Court's decisions regarding the timeliness of Plaintiff's claims.

2018, the Court granted Defendants leave to file their motion for summary judgment, and set a briefing schedule.  (Dkt. #46).

On March 7, 2019, Defendants filed their motion for summary judgment and supporting papers, including a Local Rule 56.1 Statement of Undisputed Facts.  (Dkt. #56, 57, 58, 59).  On May 22, 2019, Defendants filed a letter, noting that Plaintiff had failed to oppose their motion for summary judgment and requesting that the motion be granted.  (Dkt. #65).  On May 30, 2019, the Court received a letter from Plaintiff, requesting additional time to oppose Defendants' motion for summary judgment.  (Dkt. #66).  The Court granted Plaintiff this extension on May 31, 2019.  (Dkt. #67).  Plaintiff filed his brief in opposition to Defendants' motion for summary judgment on June 18, 2019.  (Dkt. #69).  Defendants filed their reply brief in further support of their motion for summary judgment on July 18, 2019.  (Dkt. #74).

On July 24, 2019, the Court received a letter from Plaintiff, requesting leave to file an opposition to Defendants' Rule 56.1 Statement.  (Dkt. #75).  The Court granted Plaintiff leave to file a counterstatement on July 31, 2019.  (Dkt. #76).  Plaintiff filed his Rule 56.1 Counterstatement on September 20, 2019.  (Dkt. #79).  The Court then granted Plaintiff leave to file exhibits in support of his Rule 56.1 Counterstatement on or before December 15, 2019.  (Dkt. #84).  The motion became fully briefed when the Court received Plaintiff's exhibits in support of his Rule 56.1 Counterstatement on December 27, 2019.  (Dkt. #85).

**DISCUSSION**

**A.    Applicable Law**

    **1.    Motions for Summary Judgment Under Federal Rule of Civil Procedure 56**

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[7] A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).

"It is the movant's burden to show that no genuine factual dispute exists" and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). If the movant has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a genuine issue for trial."

---

[7]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) … chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

9

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citations and quotation marks omitted). The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

In deciding a motion for summary judgment, "a district court generally 'should not weigh evidence or assess the credibility of witnesses.'" *Rojas* v. *Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Hayes* v. *N.Y.C Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)). But to that general rule, the Second Circuit has recognized an exception:

> in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.

*Jeffreys*, 426 F.3d at 554 (internal citation omitted) (quoting *Anderson*, 477 U.S. at 252). In this rare setting, a court considering a summary judgment motion may make credibility determinations. *SEC* v. *Jankovic*, No. 15 Civ. 1248 (KPF), 2017 WL 1067788, at *8 (S.D.N.Y. Mar. 21, 2017). Even then, the Second Circuit has cautioned that, "[i]f there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete." *Jeffreys*, 426 F.3d at 555 n.2 (emphasis and citation omitted). Instead, such credibility

assessments are to be reserved for "extraordinary cases, where the facts alleged are so contradictory that doubt is cast upon their plausibility." *Rojas*, 660 F.3d at 106 (citation and quotation marks omitted). A district court "must ask not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Simpson* v. *City of New York*, 793 F.3d 259, 265 (2d Cir. 2015).

### 2. Motions for Summary Judgment in *Pro Se* Cases

In a *pro se* case, the court must take an additional step and liberally construe the *pro se* party's pleadings "to raise the strongest arguments that they suggest." *McPherson* v. *Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos* v. *Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

This task has been complicated by Plaintiff's imperfect compliance with Local Rule 56.1. Under that rule, a movant is required to identify admissible evidence in support of each factual assertion in his or her Rule 56.1 statement. *See* S.D.N.Y. Local Rule 56.1(d) ("Each statement by the movant … pursuant to Rule 56.1(a) … must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). Conversely, a non-movant seeking to controvert these factual assertions must also cite to admissible evidence, and where properly supported facts in a Local Rule 56.1 statement are denied with only conclusory assertions, the court will find such facts to be true. *See id.*; *id.* at 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by

the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.").  Plaintiff has made clear which of Defendants' proffered facts he disputes, but has not identified any admissible evidence in support of his disputes.  (*See* Pl. 56.1).

"*Pro se* litigants are … not excused from meeting the requirements of Local Rule 56.1." *Wali* v. *One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009) (citing *Vt. Teddy Bear* , 373 F.3d at 246).  Nevertheless, even where there is incomplete compliance with the Local Rules, a court retains discretion "to consider the substance of the plaintiff's arguments." *Id.* (citing *Holtz* v. *Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." (internal quotation marks omitted))); *see also Hayes* v. *Cty. of Sullivan*, 853 F. Supp. 2d 400, 406 n.1 (S.D.N.Y. 2012) ("In light of Plaintiff's *pro se* status, the Court overlooks his failure to file a Local Rule 56.1 Statement and conducts its own independent review of the record.").  To be fair to all parties, the Court will rely principally on its own assiduous review of the record.

**B.    Analysis**

Plaintiff's Third Amended Complaint brings two claims against Defendants, each alleging a violation of his Eighth Amendment right to be free from cruel and unusual punishment:  (i) Defendants Davis, Green, Laraque,

and Llarch failed to satisfy their duty to protect Plaintiff from being assaulted with human waste; and (ii) Defendant Kiste employed excessive force in utilizing the OC spray.  Defendants have moved for summary judgment on both of these claims, on the bases that: (i) the claims against Defendants Kiste and Llarch are untimely; (ii) the failure to protect claim must fail as a matter of law; and (iii) even if the excessive force claim against Defendant Kiste were timely, it must fail as a matter of law.  In his brief in opposition, Plaintiff raises a separate Eighth Amendment claim for deliberate indifference to medical needs, which claim Defendants argue also fails as a matter of law.

The Court first addresses Defendants' arguments concerning the timeliness of the claims brought against Defendants Kiste and Llarch.  The Court determines that these claims were filed outside the statute of limitations and do not relate back to timely-filed claims, and therefore grants summary judgment as to these defendants.  But the Court concludes that there is a genuine dispute of material fact concerning Plaintiff's failure to protect claim, brought against Defendants Davis, Green, and Laraque, and denies the motion for summary judgment as to them.  Finally, the Court considers, and grants summary judgment in favor of Defendants as to Plaintiff's deliberate indifference to medical needs claim.

### 1.    Plaintiff's Claims Against Defendants Kiste and Llarch Are Untimely

Defendants argue that Plaintiff's claims against Defendants Kiste and Llarch are barred by the statute of limitations.  (Def. Br. 5-9).  "Section 1983 does not provide a specific statute of limitations.  Thus, courts apply the

statute of limitations for personal injury actions under state law." *Hogan* v. *Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (citing *Owens* v. *Okure*, 488 U.S. 235, 249-51 (1989)); *Pearl* v. *City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002)). In New York, personal injury actions are subject to a three-year statute of limitations. *See Pearl*, 296 F.3d at 79. The limitations period begins to run when: (i) the plaintiff knows or has reason to know of the injuries caused by an individual defendant, *see Singleton* v. *City of New York*, 632 F.2d 185, 191 (2d Cir. 1980), *cert. denied*, 450 U.S. 920 (1981); or (ii) the plaintiff knows or has reason to know that a municipal defendant has an unconstitutional "policy or custom," *see Pinaud* v. *County of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995).

Generally speaking, plaintiffs are not allowed to circumvent New York's three-year statute of limitations by filing a complaint against a John Doe defendant within the three-year window, and then amending the complaint to name the defendant at a later time. *Hogan*, 738 F.3d at 517 (citing *Aslanidis* v. *U.S. Lines, Inc.*, 7 F.3d 1067, 1075 (2d Cir. 1993)). As a result, if a plaintiff seeks to amend a complaint to name a John Doe defendant, and the statute of limitations has already run, the plaintiff must show that the amended complaint "relates back" to the original, timely-filed complaint under Federal Rule of Civil Procedure 15(c). *Id.*; *see also S.A.R.L. Galerie Enrico Navarra* v. *Marlborough Gallery, Inc.*, No. 10 Civ. 7547 (KMW), 2013 WL 1234937, at *3 (S.D.N.Y. Mar. 26, 2013) (stating that it is the plaintiff's burden to establish that an amended claim relates back to the date of the original complaint).

In this case, Plaintiff knew or had reason to know of the injuries allegedly caused by Defendants at the time those injuries occurred: July 10 and 11, 2014. (*See generally* TAC). As a result, Plaintiff was required to file any claims that arose out of that incident by July 11, 2017. Plaintiff filed the original Complaint before that date, on May 22, 2017, naming Defendants Davis, Green, Laraque, and a John Doe defendant. (Dkt. #1). But Plaintiff did not manifest an intent to substitute Defendant Kiste in place of the John Doe defendant until January 29, 2018 (Dkt. #23), and did not in fact make the substitution until February 6, 2018 (Dkt. #27). Furthermore, Plaintiff did not add Defendant Llarch as a defendant until he filed his Second Amended Complaint on February 13, 2018. (Dkt. #31). Because the claims against Defendants Kiste and Llarch are otherwise untimely, the Court considers whether these claims "relate back" to the original Complaint under Federal Rule of Civil Procedure 15(c). *Hogan*, 738 F.3d at 517.

### a. Federal Rule of Civil Procedure 15(c) Generally

Federal Rule of Civil Procedure 15(c) lays out three situations in which an amendment to a pleading relates back to the original pleading:

(A) The law that provides the applicable statute of limitations allows relation back;

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading; or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

> (i)   received such notice of the action that it will not be prejudiced in defending on the merits; and
>
> (ii)  knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed R. Civ. P. 15(c)(1).

For an amended complaint to "relate back" to an original complaint under Rule 15(c)(1)(C), it must meet four criteria: (i) any new claim "must have arisen out of conduct set out in the original pleading"; (ii) any newly named defendant "must have received such notice that it will not be prejudiced in maintaining its defense"; (iii) any newly named defendant must have known that "but for a mistake of identity, the original action would have been brought against [him]"; and (iv) "the second and third criteria [must be] fulfilled within [the period provided by Rule 4(m) for serving the summons and complaint], and ... the original complaint [must have been] filed within the limitations period." *Barrow* v. *Wethersfield Police Dept.*, 66 F.3d 466, 468-69 (2d Cir. 1995); *see also Ceara* v. *Deacon*, 916 F.3d 208, 211 (2d Cir. 2019).

Rule 15(c)(1)(A) also permits an amended pleading to relate back when the law that provides the applicable statute of limitations allows relation back. *Hogan*, 738 F.3d at 518. Thus, "if the applicable statute of limitations is determined by state law — as is the case here — courts should assess both the state and federal relation back doctrines and apply whichever law is more generous." *Anderson* v. *City of Mount Vernon*, No. 09 Civ. 7082 (ER) (PED), 2014 WL 1877092, at *2 (S.D.N.Y. Mar. 28, 2014).

### b.     Plaintiff's Claim Against Defendant Llarch Does Not Relate Back to the Original Complaint

The Second Circuit has interpreted Rule 15(c)(1)(C) "to preclude relation back for amended complaints that add new defendants, where the newly added defendants were not named originally because the plaintiff did not know their identities." *Hogan*, 738 F.3d at 517. "Rule 15(c) explicitly allows the relation back of an amendment due to a 'mistake' concerning the identity of the parties ... [;] the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake." *Barrow*, 66 F.3d at 470.

Here, Plaintiff cannot claim that, "but for a mistake of identity," he would have brought claims against Defendant Llarch in the original Complaint. The original Complaint named four defendants: Defendants Davis, Green, Laraque, and a John Doe defendant later named as Defendant Kiste. The Complaint did not make any allegations concerning a misidentified individual who was actually Defendant Llarch. Nor did Plaintiff substitute Defendant Llarch in place of a previously named defendant upon realizing that there had been a mistake of identity.

Instead, Plaintiff named Defendant Llarch as an additional party on February 13, 2018, after the statute of limitations had run. Courts within this District have held that the relation-back provision of Rule 15(c) does not apply in such circumstances. *See, e.g.*, *Chunn* v. *Amtrak*, No. 14 Civ. 6140 (PAC) (HBP), 2017 WL 9538164, at *11 (S.D.N.Y. May 11, 2017) (quoting *Pikos* v. *Liberty Maint., Inc.*, No. 09 Civ. 4031 (WFK) (RER), 2015 WL 6830670, at *3-4

(E.D.N.Y. Nov. 6, 2015)); *Hahn* v. *Office & Prof'l Emps. Int'l Union*, 107 F. Supp. 3d 379, 384-86 (S.D.N.Y. 2015) (finding no mistake where "[t]he plaintiff has sued [who he believes is] the right defendant, and simply neglected to sue another defendant who might also be liable" (quoting *In re Vitamin C Antitrust Litig.*, 995 F. Supp. 2d 125, 129 (E.D.N.Y. 2014)).

The result would be no different if the Court were to apply New York's relation-back rules. New York's general relation-back statute, § 203 of the Civil Practice Law and Rules, is "patterned largely after the Federal relation back rule." *Buran* v. *Coupal*, 87 N.Y.2d 173, 179 (1995); *see also Abdell* v. *City of New York*, No. 05 Civ 8453 (KMK) (JCF), 2006 WL 2620927, at *2 (S.D.N.Y. Sept. 12, 2006) ("The New York relation-back doctrine tracks the federal rule."). As the New York Court of Appeals has explained, the New York rule also requires that a plaintiff make a "mistake" as to the identity of the proper parties. *Buran*, 87 N.Y.2d at 176. Plaintiff's failure to mention Llarch, or any John Doe entity standing in the place of Llarch, in the original Complaint is "not the type of 'mistake' contemplated by New York's relation-back rule." *See Nollah* v. *New York City*, No. 17 Civ. 634 (JPO), 2018 WL 4636847, at *2-3 (S.D.N.Y. Sept. 27, 2018).

For these reasons, Plaintiff's untimely claim against Defendant Llarch does not relate back to his timely original Complaint. Because Plaintiff did not bring his claim against Defendant Llarch until after the statute of limitations had run, Defendants' motion for summary judgment is granted as to Defendant Llarch.

### c. Plaintiff's Claim Against Defendant Kiste Does Not Relate Back to the Original Complaint

Nor does Plaintiff's claim against Defendant Kiste relate back to the original Complaint. Plaintiff did not know Defendant Kiste's identity when he filed the original Complaint — he attributed Kiste's actions to a John Doe defendant. And Plaintiff did not learn Defendant Kiste's identity until after the statute of limitations had run. (*See* Dkt. #18, 27). The Second Circuit has held that a lack of knowledge about a defendant's identity cannot be characterized as a "mistake of identity." *Hogan*, 738 F.3d at 517-18. As a result, Rule 15(c)(1)(C) "preclude[s] relation back" in cases like this one, where a plaintiff names a John Doe defendant because he does not know who the identity of the defendant until the statute of limitations has run. *Id.* (citing *Tapia-Ortiz* v. *Doe*, 171 F.3d 150, 152 (2d Cir. 1999); *Barrow*, 66 F.3d at 470); *see also Ceara*, 916 F.3d at 213 (upholding lower court ruling that "Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities." (quoting *Barrow*, 66 F.3d at 470)).

But the Second Circuit has also held that, pursuant to Rule 15(c)(1)(A), New York's "more forgiving" principle of relation back for cases involving John Doe defendants must be considered. *Hogan*, 738 F.3d at 518-19. Section 1024 of the New York Civil Practice Law and Rules allows a plaintiff "who is ignorant, in whole or in part, of the name or identity of a [defendant], [to] proceed against such [defendant] as an unknown party." If the plaintiff later learns the name of the defendant, he may amend the original complaint to

reflect that name. *See* N.Y. C.P.L.R. § 1024 (McKinney 2013); *Hogan*, 738 F.3d at 518-19. To take advantage of § 1024, a plaintiff must meet two requirements: "First, the [plaintiff] must exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name. Second, the [plaintiff] must describe the John Doe party in such form as will fairly apprise the party that [he] is the intended defendant." *Hogan*, 738 F.3d at 519 (internal quotation marks and citations omitted).

The Court concludes that Plaintiff did not satisfy the first of these requirements, because he did not exercise due diligence to identify Defendant Kiste *before* the statute of limitations had run. Plaintiff filed the original Complaint on May 22, 2017, more than two years and ten months after the incident had occurred. This did not allow ample time to obtain a "*Valentin* order (which is routinely issued in this district) in order to identify the [person] he wanted to sue." *Sherrad* v. *City of New York*, No. 15 Civ. 7318 (CM), 2016 WL 1574129, at *4 (S.D.N.Y. Apr. 15, 2016). Plaintiff has neither alleged nor argued that he took any steps during that time to identify the individual who had allegedly used excessive force against him, or that he was prevented from filing the suit earlier "when a timely *Valentin* order could have yielded the information he needed well before the cut-off date." *Id.* at *6; *Smith* v. *Baugh*, No. 16 Civ. 906V (F), 2018 WL 1918283, at *3 (W.D.N.Y. Apr. 24, 2018) (collecting cases and holding that "a plaintiff's failure to more timely initiate a § 1983 action in federal court to allow sufficient time to exercise various discovery devices available to litigants in such actions counts against a plaintiff

who seeks relief pursuant to § 1024"); *Galberth* v. *Washington*, No. 14 Civ. 691 (KPF), 2016 WL 1255738, at *11 (S.D.N.Y. Mar. 29, 2016) (finding that the plaintiff failed to exercise due diligence to identify defendants by "wait[ing] more than two and one-half years after alleged misconduct to file his [§ 1983] [c]omplaint"), *aff'd*, 743 F. App'x 479 (2d Cir. 2018) (summary order).

Nor is there any indication that Plaintiff undertook any effort in the 50 days between the filing of the original Complaint and the running of the statute of limitations on July 11, 2017, to identify the John Doe defendant. To the contrary, the record reflects that Plaintiff treated his case with negligence during this time period: Plaintiff failed to provide the Court with an up-to-date mailing address, causing mailings to Plaintiff to be returned as undeliverable, and prompting the Court to order Plaintiff to show cause why his case should not be dismissed for failure to prosecute. (Dkt. #13).[8]

---

[8]    Plaintiff failed to address Defendants' timeliness arguments in his brief in opposition to the motion for summary judgment. (*Compare* Def. Br. 5-9, *with* Pl. Opp.). In his Rule 56.1 Counterstatement, however, Plaintiff argues that he was granted additional time to file an amended complaint that would substitute Defendant Kiste for John Doe. (Pl. 56.1 at 6). It is true that in January 2018, after Defendants had provided Plaintiff with Defendant Kiste's name, Plaintiff wrote to the Court concerning challenges he was facing in filing an amended complaint that would substitute Defendant Kiste. (Dkt. #21, 23). In response, the Court merely provided Plaintiff with forms needed to file an amended complaint; it did not purport to decide whether any claims made in that amended complaint would be timely. (Dkt. #22, 24). And to the extent Plaintiff's communications with the Court in January 2018 could be interpreted as diligent efforts to identify Defendant Kiste, such efforts were made after the statute of limitations had already run in July 2017. Section 1024 requires that diligent efforts be made "prior to the running of the statute of limitations." N.Y. C.P.L.R. § 1024 (McKinney 2013). "Plaintiff's diligence after the limitations period ended cannot compensate for his lack of diligence" beforehand. *Galberth* v. *Washington*, No. 14 Civ. 691 (KPF), 2016 WL 1255738, at *11 (S.D.N.Y. Mar. 29, 2016), *aff'd*, 743 F. App'x 479 (2d Cir. 2018) (summary order).

In light of Plaintiff's failure to exhibit diligence in attempting to ascertain the identity of the John Doe defendant, the claim against Defendant Kiste does not relate back to the original Complaint.  Accordingly, Defendants' motion for summary judgment is granted as to Defendant Kiste.

### 2. Plaintiff's Failure to Protect Claim Survives Defendants' Motion for Summary Judgment

With summary judgment having been granted in favor of Defendants Kiste and Llarch, three defendants remain:  Defendants Davis, Green, and Laraque (collectively, the "Remaining Defendants").  The Third Amended Complaint is best interpreted as asserting that these three correction officers violated Plaintiff's Eighth Amendment rights by failing to protect him from the actions of Inmate Brown, who threw a mixture of his urine, feces, saliva, and toilet water, hitting Plaintiff and inciting an hour-long war of excrement with other inmates in which Plaintiff was collateral damage.  The Remaining Defendants argue that their conduct does not, as a matter of law, amount to a failure to protect in violation of Plaintiff's Eighth Amendment rights.  They claim both that: (i) they did not violate Plaintiff's Eighth Amendment rights by failing to protect him; and (ii) even if they did violate Plaintiff's Eighth Amendment rights, they are entitled to qualified immunity.  For the reasons discussed below, the Court disagrees.

### a. Failure to Protect Generally

It is well settled that "[p]rison officials have a duty to ... protect prisoners from violence at the hands of other prisoners." *Farmer* v. *Brennan*, 511 U.S. 825, 828 (1994) (quoting *Cortes-Quinones* v. *Jimenez-Nettleship*, 842 F.2d 556,

558 (1st Cir. 1977)); *see also Ross* v. *Correction Officers John & Jane Does 1-5*, 610 F. App'x 75, 76-77 (2d Cir. 2015) (summary order); *Villante* v. *Dep't of Corr.*, 786 F.2d 516, 522-23 (2d Cir. 1986). In order to state an Eighth Amendment claim for failure to protect an inmate, a plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and that prison officials acted with deliberate indifference to that risk and the inmate's safety. *See Farmer*, 511 U.S. at 835-36. A plaintiff must show that prison officials had knowledge of, and disregarded, "an excessive risk to inmate health or safety." *Id.* at 837.

Courts apply a two-pronged test to analyze claims brought under the Eighth Amendment.[9] *First*, under the objective prong, the alleged deprivation must be "sufficiently serious." *Salahuddin* v. *Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citation omitted); *Darnell* v. *Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) ("Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, which includes the risk of serious damage to physical and mental soundness." (internal quotation marks and citations omitted)). *Second*, under the subjective prong, a plaintiff must demonstrate that the charged defendant acted with a "sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280 (citation omitted). A prison official acts with a sufficiently culpable state of mind when

---

[9]   Plaintiff was a convicted inmate, and not a pretrial detainee, and thus the Court analyzes his claims under the Eighth Amendment.

he is "deliberately indifferent" to the health or safety of an inmate. *Farmer*, 511 U.S. at 834. Accordingly, to state a claim, a plaintiff must allege facts showing that a defendant knew of and disregarded an excessive risk of inmate health and safety or that he was aware of facts from which it could reasonably be inferred that a substantial risk of serious harm existed. *Farmer*, 511 U.S. at 837; *Darnell*, 849 F.3d at 30-33.

### b. A Triable Issue Exists Concerning Whether the Conditions of Plaintiff's Confinement Were Objectively Sufficiently Serious

As the Remaining Defendants acknowledge, there is no static test to determine whether a deprivation is sufficiently serious to meet the objective prong. "[I]nstead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.'" *Darnell*, 849 F.3d at 30 (quoting *Blissett* v. *Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)). A plaintiff must show that the deprivation results in a denial of "the minimal civilized measure of life's necessities," *Wilson* v. *Seiter*, 501 U.S. 294, 298 (1991) (citation omitted), but need not show that he suffered "serious injury" to succeed on an Eighth Amendment claim, *Willey* v. *Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015).

The objective prong may be satisfied where an inmate is subjected to violent acts at the hands of other inmates. *Hendricks* v. *Coughlin*, 942 F.2d 109, 113 (2d Cir. 1991) (holding that "an inmate's claim that prison officials failed, as a result of their deliberate indifference, to protect him from the violent actions of other inmates may state a viable § 1983 cause of action"). It may also be satisfied where prison officials fail to provide "humane conditions of

confinement" and take reasonable measures to "guarantee the safety of the inmates." *Berry* v. *N.Y.C. Dep't of Corr.*, No. 12 Civ. 7819 (RWS), 2014 WL 2158518, at *3 (S.D.N.Y. May 22, 2014), *aff'd*, 622 F. App'x 10 (2d Cir. 2015) (summary order). With regard to claims relating to conditions of confinement, the Second Circuit has held that exposure to human waste may satisfy the objective prong, depending on the "duration and the severity of the exposure." *Willey*, 801 F.3d at 68. Thus, exposure to human waste, even for periods of short duration, may constitute an objectively serious deprivation. *Darnell*, 849 F.3d at 30.

The conditions Plaintiff was forced to endure would seem to exceed contemporary standards of decency. Plaintiff had a mixture of human waste — feces, urine, saliva, and toilet water — thrown at him by a fellow inmate. (Def. 56.1 ¶¶ 15, 16, 17).[10] As the mixture hit the bars of Pen #6 — which it did multiple times, as the inmate threw his waste repeatedly — it sprayed around the cell, causing Plaintiff to come into further contact with the waste. (*Id.*). When an inmate in Pen #1 retaliated by throwing urine back at Pen #6, Plaintiff was exposed to yet more waste. And though Plaintiff does not claim to have suffered a serious injury as a result, a substantial risk of serious harm did exist. The Centers for Disease Control and Prevention states that exposure to human waste or sewage may cause an "increased risk of becoming ill from

---

[10]    The Court does not imply that Inmate Brown intentionally threw the mixture at Plaintiff; the record indicates that Brown had been attempting to hit another individual in Pen #1. (Manningham Decl., Ex. C at 18:7-15). Nevertheless, Plaintiff was hit by the mixture, directly and as it ricocheted off the bars.

waterborne diseases." Centers for Disease Control and Prevention, *Guidance for Reducing Health Risks to Workers Handling Human Waste or Sewage*, https://www.cdc.gov/healthywater/global/sanitation/workers_handlingwaste.html (last visited February 24, 2020).[11]

Further, a reasonable juror could conclude that throwing human waste at another person constitutes an act of violence. The New York Penal Law would seem to support this categorization: Section 240.32 makes it a felony for an inmate to cause or attempt to cause an employee of a correction facility "to come into contact with blood, seminal fluid, urine, feces, or the contents of a toilet bowl, by throwing, tossing or expelling such fluid or material." Thus, a jury could find that Plaintiff was subjected to violence at the hands of another prisoner, which would constitute an objective deprivation under the Eighth Amendment. *Farmer*, 511 U.S. at 828 (holding that it is well settled that "[p]rison officials have a duty to ... protect prisoners from violence at the hands of other prisoners").

Finally, the Court finds that the unsanitary conditions from which the Remaining Defendants allegedly failed to protect Plaintiff would suffice to satisfy the objective prong. The Second Circuit directs courts to evaluate the "severity and duration" of unsanitary conditions on a case-by-case basis when evaluating whether conditions of confinement amount to a constitutional violation, and has rejected a "bright-line durational requirement" or a "minimal

---

[11] Under the Federal Rules of Evidence, a "court may judicially notice a fact that is not subject to reasonable dispute" where it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

level of grotesquerie" requirement for viable unsanitary-conditions claims. *Darnell*, 849 F.3d at 31 (quoting *Willey*, 801 F.3d at 68). While "the severity of an exposure may be less quantifiable than its duration, [] its qualitative offense to a prisoner's dignity should be given due consideration." *Id.*

The Remaining Defendants argue that Plaintiff's exposure to waste was not severe enough to meet the objective prong because he was nothing "more than a bystander," was "splashed with residual bodily waste," and "was not forced to stay in the cell for very long." (Def. Br. 11). The Court disagrees with these factual assertions, as well as the legal significance ascribed to them. While Plaintiff was not the intended target of Inmate Brown's attack, he ceased to be a mere bystander when Inmate Brown hit him with human waste. Plaintiff was then forced to stay in the cell for roughly one hour, during which time human waste was intermittently thrown back and forth between inmates. (Def. 56.1 ¶¶ 15, 16, 17, 22; Manningham Decl., Ex. C at 20:3-19). As the waste was thrown, it "spray[ed] all over the place," hitting Plaintiff. (Def. 56.1 ¶¶ 16, 17).

These conditions are comparable to those present in *Fruit* v. *Norris*, 905 F.2d 1147, 1151 (8th Cir. 1990). There, inmates were forced to clean a portion of a prison's raw-sewage lift-pump well. *Id.* at 1148-49. For ten minutes at a time, inmates entered the well, into which a continuous stream of raw sewage was being pumped, without safety equipment. *Id.* In *Willey*, the Second Circuit held that the factual scenario presented in *Fruit* — a ten-minute exposure to a "shower of human excrement without protective clothing and

equipment" — was sufficient to state a claim for an Eighth Amendment violation. 801 F.3d at 68. Plaintiff here was subjected to a comparable factual scenario. (Def. 56.1 ¶¶ 15, 16, 17, 22; Manningham Decl., Ex. C at 20:3-19). The severity of his exposure was compounded by the manner in which it occurred: Plaintiff was forced to watch Inmate Brown mix his own bodily waste in anticipation of an assault on other inmates, and pleaded to be moved, knowing what awaited those detained in Pens #1 and #6. When those pleas fell on deaf ears, Plaintiff's direst predictions were fulfilled; he was the recipient of waste thrown by Brown himself, and then was forced to shelter in place as the two pens' occupants hurled waste at each other for nearly an hour. After prison officials arrived to quell the dispute, Plaintiff was forced to lie down on an excrement-strewn floor. The ensuing humiliation is especially offensive to an inmate's — indeed, any person's — dignity. The Court concludes that a triable dispute exists as to whether Plaintiff has demonstrated a deprivation that was sufficiently serious to satisfy the first, objective prong of the Eighth Amendment failure-to-protect analysis.

### c. A Triable Issue Exists Concerning Whether the Remaining Defendants Had a Sufficiently Culpable State of Mind

The uncontested facts would also permit a reasonable jury to find that the Remaining Defendants acted with deliberate indifference towards Plaintiff in failing to take any action to prevent the debasement to which he was subjected. The parties agree that Plaintiff warned the Remaining Defendants that Inmate Brown was mixing his bodily waste; that Brown planned to throw

that waste; and that Plaintiff did not want to be in Pen #6 when the waste was thrown. (Def. 56.1 ¶¶ 11, 13). A correction officer then approached Brown to prevent him from throwing the mixture, and Brown responded by threatening to throw the mixture at the officer. (Def. 56.1 ¶ 14). There is no indication that the Remaining Defendants took any further actions to stop Brown, or to protect Plaintiff.

The Remaining Defendants argue that the subjective prong has not been met for two reasons: (i) they were not aware that the waste was going to be thrown at Plaintiff; and (ii) even if they were, the Remaining Defendants responded reasonably to that risk. (Def. Br. 10-13). The Court disagrees on both counts.

*First*, the Remaining Defendants argue that they were not deliberately indifferent, because Plaintiff did not specifically advise them that Inmate Brown planned to throw the mixture of human waste *at Plaintiff*; rather, Plaintiff merely reported that Brown was going to throw the mixture. (Def. Br. 12). The Remaining Defendants claim that, from this generalized report, they "could not have drawn the inference that plaintiff faced an imminent, substantial risk of serious harm," and could only have inferred that "plaintiff would be present when Brown threw his bodily fluids at a different inmate." (*Id.*). In essence, the Remaining Defendants argue that, because Plaintiff did not expressly say that Brown was going to throw the mixture of bodily waste at him, no reasonable jury could find that the Remaining Defendants were aware of a substantial risk that Plaintiff would be hit by that waste. But this argument,

which reads a "magic words" requirement into the standard for subjective deliberate indifference, must be rejected.

To review, the test for deliberate indifference in the context of an Eighth Amendment claim brought by a convicted inmate is a subjective, not an objective one. *See Darnell*, 849 F.3d at 34-36 (holding that the test for deliberate indifference is subjective in the Eighth Amendment Context and objective in the case of suits brought by pretrial detainees under the Fourteenth Amendment). Thus, Plaintiff must establish that the Remaining Defendants were "subjectively aware" of a substantial risk, not merely that they should have known of the substantial risk. *Id.* Nevertheless, "[w]hether ... prison official[s] had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact finder may conclude that ... prison official[s] knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

Based on the record before it, and drawing all inferences in favor of Plaintiff, the Court concludes that a reasonable jury could find that the Remaining Defendants were aware of a substantial risk that Plaintiff would be exposed to Inmate Brown's bodily waste. *See Anderson*, 477 U.S. at 248 (holding that a genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"); *see also Hayes* v. *N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620-21 (2d Cir. 1996) (finding that affirmative inferences in favor of the non-movant are required when

deciding motions for summary judgment concerning the subjective deliberate indifference of prison officials).  The Remaining Defendants indisputably knew that Brown intended to throw a mixture of his bodily waste from within Pen #6, which he shared with Plaintiff, and that Plaintiff had requested not to be present in the cell when the throwing began.  (Def. 56.1 ¶¶ 11, 13).  The seriousness of Brown's intention was underscored by his threat to throw the waste at the one correction officer who attempted to intercede.  (*Id.* at ¶ 14).  From this alone, a jury could find that the risk of Plaintiff being exposed to human waste if he remained in Pen #6 was so obvious that the Remaining Defendants knew of it.

*Second*, the Remaining Defendants argue that, even if they were aware of the substantial risk Plaintiff faced, they are not liable for any harm suffered because they responded reasonably to that risk.  (Def. Br. 11-13).  The Remaining Defendants are correct that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer*, 511 U.S. at 844.  But the record does not support the Remaining Defendants' contention that they undertook reasonable efforts to protect Plaintiff from harm.  After learning that Inmate Brown intended to throw the bodily waste that he was accumulating in plain view, a single correction officer tried, verbally, to persuade Brown not to do so.  (Def. 56.1 ¶ 14).  When this attempt failed, and Brown threatened to throw the waste at the officer, the officer promptly left the scene.  (*Id.*; Manningham Decl., Ex. C at

19:5-12).  Aside from that single attempt to intercede, the Remaining Defendants made no effort to stop Brown or to remove Plaintiff from the situation in the twenty minutes that preceded the incident.

The "reasonable response" exception to liability for failure to protect has been successfully invoked in situations where officers took steps that were reasonably calculated to resolve the underlying risk to the inmate.  *See Ford* v. *Deacon*, — F. App'x —, No. 18-3269, 2019 WL 6271702, at *3 (2d Cir. Nov. 25, 2019) (summary order) (affirming grant of summary judgment against failure to protect claim where inmate filed grievance concerning condition of cell, and officers inspected the cell and repaired any issues found); *see also El-Hanafi* v. *United States*, No. 13 Civ. 2072 (GHW), 2015 WL 72804, at *17-18 (S.D.N.Y. Jan. 6, 2015) (finding prison medical official not liable for failing to diagnose an inmate's illness when the official ordered medical testing for the inmate to assist in diagnosing).  Here, the Remaining Defendants were aware that the officer's attempt to stop Inmate Brown had failed and yet made no other efforts to respond to the risk Brown's conduct created.  Even after the incident began, and inmates were throwing bodily waste around the cells, the Remaining Defendants did not take any action to restore order, other than a verbal attempt — the sincerity of which is contested — to stop the inmates.  By the time a response team arrived, the incident had been ongoing for roughly an hour and the harm to Plaintiff had already occurred.  (Manningham Decl., Ex. C at 20:3-19; Def. 56.1 ¶¶ 19, 20, 22).  A jury could easily reject the

Remaining Defendants' argument that this conduct was reasonably calculated to prevent the risk of harm to Plaintiff.

The Court concludes that Plaintiff has put forth evidence that would permit a reasonable jury to find that the Remaining Defendants were subjectively deliberately indifferent to the risk Plaintiff faced. Thus, a triable issue exists concerning the second prong of the Eighth Amendment analysis.

### d. The Remaining Defendants Are Not Entitled to Qualified Immunity at This Stage of the Proceedings

Finally, the Remaining Defendants argue that, even if they violated Plaintiff's Eighth Amendment rights by failing to protect him, summary judgment should be granted in their favor because they are entitled to qualified immunity. Because the Remaining Defendants are being sued for actions taken in the course of their official duties, the doctrine of qualified immunity would shield them from liability for civil damages "unless [the] plaintiff pleads facts showing [i] that the official violated a statutory or constitutional right, and [ii] that the right was 'clearly established' at the time of the challenged conduct." *Ricciuti* v. *Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016) (quoting *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 735 (2011)). At the summary judgment stage, a claim may be dismissed on qualified immunity grounds only when a court finds that an official has met his or her burden of demonstrating that no rational jury could find these two prongs to be satisfied. *Coollick* v. *Hughes*, 699 F.3d 211, 219 (2d Cir. 2012).

The Court has already concluded that a rational jury could find that the Remaining Defendants violated Plaintiff's Eighth Amendment rights by failing

to protect him.  All that remains is to determine whether such a right was "clearly established" as of July 2014.  To begin, the Court acknowledges that the Supreme Court has "lately emphasized the breadth of qualified immunity protection," particularly with regard to the clearly established prong.  *Francis* v. *Fiacco*, 942 F.3d 126, 145-46 (2d Cir. 2019) (citing *City of Escondido* v. *Emmons*, — U.S. —, 139 S. Ct. 500, 503 (2019) (per curiam)).  While the Supreme Court "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate."  *White* v. *Pauly*, — U.S. —, 137 S. Ct. 548, 551 (2017) (per curiam) (internal quotation marks, citation, and brackets omitted).  That precedent "must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia* v. *Wesby*, — U.S. —, 138 S. Ct. 577, 590 (2018).  Moreover, the Supreme Court has "repeatedly told courts ... not to define clearly established law at a high level of generality," *City of San Francisco* v. *Sheehan*, 575 U.S. 600 (2015) (quoting *al-Kidd*, 563 U.S. at 742), instead emphasizing that "clearly established law must be 'particularized' to the facts of the case," *White*, 137 S. Ct. at 552 (quoting *Anderson* v. *Creighton*, 483 U.S. 635, 640 (1987)).  In short, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *al-Kidd*, 563 U.S. at 743 (quoting *Malley* v. *Briggs*, 475 U.S. 335, 341 (1986)).

At the time of the incident, inmates such as Plaintiff had a clearly established right to be protected from "violence at the hands of other prisoners." *Farmer*, 511 U.S. at 828. Further, inmates had a clearly established right to "humane conditions of confinement," with prison officials providing "reasonable measures to guarantee the safety of inmates." *Id.* at 832. The Remaining Defendants argue, however, that these rules are defined at too high a level of generality to have clearly established that their conduct would violate the law. (Def. Br. 14). Specifically, the Remaining Defendants note that there are no "Second Circuit cases which say there is a duty to protect inmates from being near other inmates who are throwing feces or urine." (*Id.*).

And while the Remaining Defendants are correct on this narrow point, there is Second Circuit case law clearly establishing that prison officials "spraying an inmate with vinegar, excrement, and machine oil" violates the Eighth Amendment. *Hogan*, 738 F.3d at 516-17. It is true that *Hogan* dealt with prison officials, not fellow inmates, spraying an inmate with excrement. *Id.* That does not render *Hogan* irrelevant for purposes of clearly establishing law in this case. The Second Circuit need not have issued a decision finding that the precise conduct in which the Remaining Defendants engaged violated the Constitution for such a violation to be clearly established. *Wesby*, 138 S. Ct. at 590. All that is necessary is a body of relevant case law, particularized to the facts of the case, that makes plain that the Remaining Defendants' conduct was in violation of the Eighth Amendment. *Id.*

Such a body of relevant case law exists here. The facts and ruling of *Hogan*, read in conjunction with black-letter law providing that "prison officials may not abuse prisoners directly, nor may they indirectly subject prisoners to harm by facilitating abuse at the hands of prisoners' fellow inmates," *Randle* v. *Alexander*, 960 F. Supp. 2d 457, 471 (S.D.N.Y. 2013) (collecting Second Circuit case law), places it beyond debate that a prison official cannot permit one inmate to spray another inmate with human waste. *See also Francis* v. *City of New York,* No. 17 Civ. 1453 (LAK) (HBP), 2018 WL 4659478, at *4 (S.D.N.Y. Aug. 21, 2018) ("Courts have found that, when an inmate informs corrections officers about a specific fear of assault and is then assaulted, this is sufficient to proceed on a claim of failure to protect." (quoting *Beckles* v. *Bennett*, No. 05 Civ. 2000 (JSR), 2008 WL 821827 at *17 (S.D.N.Y. Mar. 26, 2008))). Because a reasonable jury could find that the Remaining Defendants were aware of a substantial risk that Plaintiff would be exposed to repeated sprays of bodily waste over the course of an hour, that jury could find that the Remaining Defendants violated a clearly established right in failing to protect Plaintiff.[12]

A second body of case law forecloses qualified immunity in this case: the Eighth Amendment's clearly established protections against unsanitary

---

[12] The premise of the Remaining Defendants' argument, that they are entitled to qualified immunity unless there is a precedential case establishing that there is a duty to protect inmates from being sprayed by another inmate's bodily waste, would require a "case directly on point" before qualified immunity can be defeated. (Def. Br. 13-14). But the Supreme Court has explicitly held the law "does not require a case directly on point for a right to be clearly established," so long as "existing precedent [has] placed the statutory or constitutional question beyond debate." *White* v. *Pauly*, — U.S. —, 137 S. Ct. 548, 551 (2017) (per curiam) (internal quotation marks, citation, and brackets omitted).

conditions of confinement. *See Gaston* v. *Coughlin*, 249 F.3d 156, 164-66 (2d

Cir. 2001). Whether this right has been violated through exposure to human

waste "depends on both the duration and the severity of the exposure." *Willey*,

801 F.3d at 68 (collecting intra- and inter-Circuit case law that predates July

2014). In *Fruit*, a 1990 decision cited in *Willey*, the Eighth Circuit held that a

reasonable jury could find that the Eighth Amendment had been violated when

an inmate was exposed to a "shower of excrement without protective clothing

and equipment" for ten minutes. *Fruit*, 905 F.2d at 1151. The conditions to

which Plaintiff was exposed here — human waste being splashed around his

cell repeatedly over the course of an hour while prison officials provided

running commentary from an adjoining room but no assistance — are

analogous. And while it is true that the Second Circuit's *Willey* decision was

issued after the events at issue here, this Court finds that its legal conclusions

were obvious, and would have been obvious to a competent officer in July

2014.

Typically, only decisions by the Supreme Court or the Second Circuit

suffice to "clearly establish" that conduct is unlawful within this Circuit. *See*

*Lynch* v. *Ackley*, 811 F.3d 569, 578-79 (2d Cir. 2016); *but see id.* at 579 n.9.

But the Second Circuit has recognized that law may be clearly established by

decisions from other circuits, if those decisions "clearly foreshadow a particular

ruling on the issue." *Terebesi* v. *Torreso*, 764 F.3d 217, 231 (2d Cir. 2014).

*Willey*'s reliance on *Fruit*, and the two Circuits' identical analyses of conditions

of confinement claims, makes clear that *Fruit* foreshadowed the Second

Circuit's own ruling on the issue.  *Wiley*, 801 F.3d at 68.  More fundamentally, *Fruit* reflects that the "contours of the right in question [were] clearly established" when *Fruit* was decided in 1990:  exposing an inmate to a shower of human waste, even for a short period of time, violates the Eighth Amendment.  *Id.* at 231 n.12.  Given the law and the facts addressed in this section, a reasonable jury could find that the Remaining Defendants' failure to protect Plaintiff from unsanitary conditions violated a clearly established right.

The Remaining Defendants simply could not have believed, based on the governing law at the time, that their studied inaction in the face of grotesque, unsanitary chaos accorded with the Eighth Amendment.  For all of the reasons discussed above, the Court concludes that the Remaining Defendants have failed to meet their burden of demonstrating that no rational jury could conclude "[i] that the official violated a statutory or constitutional right, and [ii] that the right was clearly established at the time of the challenged conduct." *Coollick*, 699 F.3d at 219 (quoting *al-Kidd*, 131 S. Ct. at 2080).  Thus, the Remaining Defendants are not entitled to qualified immunity from Plaintiff's failure to protect claim at this point in the proceedings.

### 3. Summary Judgment Is Granted As to Plaintiff's Deliberate Indifference to Medical Needs Claim

Plaintiff's brief in opposition to Defendants' motion for summary judgment contains a few sentences that appear to assert a claim for deliberate indifference to medical needs in violation of the Eighth Amendment:  Plaintiff claims that, after the response team had arrived in the Main Intake area and removed him from Pen #6, he was "held in the hallway for an unreasonable

amount of time (hours)" before he was given medical treatment in the form of a medical shower, an eye wash, and an evaluation by a physician's assistant. (Pl. Opp. 7). Similarly, Plaintiff's Local Rule 56.1 Counterstatement contains allegations (unsupported by citations to the record), that Plaintiff was held in the hallway for approximately three hours while other inmates were given medical treatment before he was given any treatment. (Pl. 56.1 ¶ 35).

Defendants argue that the operative Complaint does not include any allegations that would suggest that it asserted a claim for deliberate indifference to medical needs. (Def. Reply 6-7). The Court agrees. The Third Amended Complaint merely alleges that Plaintiff was given an eye wash and a medical shower; it does not contain any information about how long Plaintiff waited to have this treatment provided, nor does it include any suggestion that Plaintiff believed the delay in treatment or treatment itself was unreasonable. (*See generally* TAC). Because Plaintiff's deliberate indifference to medical needs claim is not present in the operative complaint, the Court need not consider it. *See King* v. *Puershner*, No. 17 Civ. 1373 (KMK), 2019 WL 4519692, at *10 (S.D.N.Y. Sept. 19, 2019) (finding that "[i]t is well settled that a [*pro se*] litigant may not raise new claims not contained in the complaint in opposition to a motion for summary judgment" (quoting *Mediavilla* v. *City of New York*, 259 F. Supp. 3d 82, 106 (S.D.N.Y. 2016))); *Mira* v. *Argus Media*, No. 15 Civ. 9990 (RJS), 2017 WL 1184302, at *3 n.4 (S.D.N.Y. Mar. 29, 2017) ("Although district courts sometimes consider new factual allegations made in a *pro se* plaintiff's opposition briefs where they are consistent with those in the complaint … they

do not consider entirely new claims."); *Carby* v. *Holder*, No. 11 Civ. 5775 (DLC), 2013 WL 3481722, at *7 (S.D.N.Y. July 10, 2013) ("Discovery has concluded, and [plaintiff] has made no request to amend her complaint to include this claim. It is generally inappropriate for a [*pro se*] plaintiff to raise new claims for the first time in opposition to a motion for summary judgment.").

That being said, the Court takes notice of the fact that Plaintiff's original Complaint (Dkt. #1), First Amended Complaint (Dkt. # 29), and Second Amended Complaint (Dkt. #31), do contain some allegations about the amount of time that Plaintiff was forced to wait for medical treatment after he was removed from Pen #6. Read liberally, these pleadings could be construed as asserting a claim for deliberate indifference to medical needs. And the Second Amended Complaint was the operative complaint for the majority of fact discovery, suggesting that Defendants might have been on notice to seek discovery concerning such a claim. (Dkt. #20, 29). Because Defendants were aware that Plaintiff took issue with the timing in which they provided him access to medical treatment, it could be argued that they would not be prejudiced by inclusion of the denial of medical treatment claim at this point in the proceedings. *See Simpson* v. *Town of Warwick Police Dep't*, 159 F. Supp. 3d 419, 440 (S.D.N.Y. 2016) ( "However, under Federal Rule of Civil Procedure 15(b), the Court may consider claims outside those raised in the pleadings 'so long as doing so does not cause prejudice' to defendants. Accordingly, in contrast to claims that are 'entirely new,' claims that are 'related to or are mere variations of previously pleaded claims ... may be raised on a motion for

summary judgment where the defendant was clearly on notice from the complaint and was not unfairly prejudiced.'" (quoting, first, *Cruz* v. *Coach Stores, Inc.*, 202 F.3d 560, 569 (2d Cir. 2000), and second, *Henry* v. *Metro. Transp. Auth.*, No. 07 Civ. 3561 (DAB), 2014 WL 4783014, at *10 (S.D.N.Y. Sept. 25, 2014))).

Even if the Court were to consider Plaintiff's deliberate indifference to medical needs claim and read the allegations in Plaintiff's opposition brief and 56.1 Counterstatement as amending the Third Amended Complaint, the claim would fail. "[I]n cases where a prisoner alleges 'a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" *Benjamin* v. *Pillai*, — F. App'x —, 2019 WL 5783304, at *2 (2d Cir. Nov. 6, 2019) (summary order) (quoting *Smith* v. *Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003)). Moreover, "the seriousness of a delay in medical treatment may be decided 'by reference to the effect of delay in treatment. Consequently [,] delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.'" *Smith*, 316 F.3d at 186 (alterations and emphasis omitted) (quoting *Hill* v. *Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994)). Here, Plaintiff has alleged that he was forced to wait three hours to receive medical attention after being exposed to human waste and OC spray. (Pl. Opp. 7). He has not alleged that the delay in treatment caused his condition to worsen.

Nor has he challenged the reasonableness of the medical treatment that he eventually received. And the reason that Plaintiff has identified for the delay in treatment is, at worst, benign: Defendants were providing medical treatment to each affected inmate in turn, starting with the inmates who suffered the worst injuries, including the inmates who were directly targeted with the OC spray. (Pl. Opp. 7; Pl. 56.1 ¶ 35). These allegations would not support a plausible claim for deliberate indifference to medical needs. *See Bilal* v. *White*, 494 F. App'x 143, 145-146 (2d Cir. 2012) (summary order) (holding that allegations of "temporary delay or interruption in the provision of otherwise adequate medical treatment" lasting "only a few hours" did not, without more, support a viable Eighth Amendment claim).[13]

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to Defendants Kiste and Llarch. The motion is DENIED as to Defendants Davis, Green, and Laraque. The Clerk of Court is directed to

---

[13] Plaintiff's brief in opposition also contains a conclusory allegation that a medic "sent him back to a partially decontaminated cell where contact with cell bars reactivated [the] O.C. chemical agent's burning sensations. Any contact with the structure of [the] cell was equivalent to a second exposure." (Pl. Opp. 7). A similar allegation was present in Plaintiff's original Complaint (Dkt. #1), but no similar facts are alleged in the First Amended Complaint, Second Amended Complaint, Third Amended Complaint, or 56.1 Counterstatement. (Dkt. #29, 31, 39, 79). This allegation does not suggest that any named Defendant was responsible for Plaintiff's alleged second exposure to the OC spray and could not have put Defendants on notice of such a claim against them. It would be prejudicial to Defendants to allow the second-exposure allegation, which was not present in the operative Complaint, to amend Plaintiff's pleadings such that it is asserted against them. Thus, the Court will not consider this allegation, raised for the first time in Plaintiff's opposition. *See Pandozy* v. *Segan*, 518 F. Supp. 2d 550, 554 n. 1 (S.D.N.Y. 2007) (declining to consider new claims raised in a *pro se* plaintiff's opposition papers), *aff'd*, 340 F. App'x 723 (2d Cir. 2009) (summary order).

terminate the motion at docket entry 56.  The Clerk of Court is directed to terminate Defendants Llarch and Kiste from this proceeding.

In order address potential next steps in this matter, the parties are hereby ORDERED to appear for a telephonic conference in this matter on **March 23, 2020, at 2:00 p.m.,** in Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York 10007.

At the appointed date and time for the conference, the Warden or other official in charge of the Intake Center shall produce prisoner Anton F. Liverpool, Identification No. 155581, at a suitable location within the Intake Center equipped with a telephone, for the purpose of participating by telephone in the conference with the Court and defense counsel in the above referenced matter.  At the appointed time, the parties shall call **(888) 363-4749** and enter access code **6624801**. Please note, the phone conference line will not be available prior to 2:00 p.m.  Counsel for Defendants must (i) transmit this Order to the Warden forthwith; (ii) contact the Intake Center forthwith to arrange the call and to determine the telephone number at which *pro se* plaintiff will be reachable at the above time and date; and (iii) telephone the Court with *pro se* plaintiff on the line at the time and date of the conference.

SO ORDERED.

Dated:     February 26, 2020
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

*Sent by First Class Mail to:*

Anton Liverpool
No. 155581
Intake Center PO Box 8249
Cranston, Rhode Island 02920